Filed 11/12/25  P. v. Alhasan CA4/3

### NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### FOURTH APPELLATE DISTRICT

### DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G063365 |
| v. | (Super. Ct. No. 18NF3018) |
| AMER SALEH ALHASAN, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Orange County, Kimberly Menninger, Judge. Affirmed and remanded with directions.

Joanna McKim, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Senior Assistant Attorney General, Collette C. Cavalier and James H. Flaherty III, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted Amer Saleh Alhasan of first degree murder. We conclude the trial court did not err in admitting evidence of his prior uncharged acts of domestic violence, and substantial evidence supports the jury's finding of premeditation and deliberation. We therefore affirm the judgment but remand the matter so the court may correct a clerical error in the abstract of judgment.

FACTS

I.

THE KILLING

Alhasan began dating Tiyanie "Pip" Ly, a single mother of three young children, in summer 2018. They argued often, and Pip suspected Alhasan was cheating on her. As it turns out, Alhasan was engaged to marry another woman in Jordan. That woman did not know about Pip.

Alhasan was low on funds and having trouble paying his bills, so he moved into his friend Steven's apartment in July 2018. Pip sometimes helped Alhasan with his expenses, but they often fought about money.

Late one Saturday night in October 2018, Pip visited Alhasan at Steven's apartment and told him she was pregnant with twins. The couple woke up Steven to get his advice. Steven told them Alhasan would have a hard time supporting children given his financial troubles, but it was Pip's decision about whether to keep the babies. Steven then went back to sleep.

Either later that night or the following night, at about 3:00 a.m., Alhasan pounded on Steven's door and told him she "decided to keep them." Alhasan was sobbing and sounded "loud" and "scary." Steven told him to "man up" and went back to sleep.

Early Monday morning, at about 6:00 a.m., Steven peeked into Alhasan's room before leaving for work to see how he was doing. He saw

Alhasan sleeping on the floor next to three large duffel bags. Pip was not there.

Cell phone records show that less than an hour later, at about 6:45 a.m., Alhasan called Pip from nearby her home, and they spoke for about 40 minutes. At about 8:00 a.m., Alhasan used his phone to look up the "cost [o]f abortion for twins."

Alhasan strangled Pip to death later that morning, but the evidence is conflicting as to the circumstances of her death.

According to Alhasan, after his call with Pip, he took some Xanax and went to sleep. When he woke up, Pip was in his bedroom, and they began to argue. Alhasan told her to leave, but Pip grabbed his testicles and penis tightly and refused to let go. Thinking she might kill him, Alhasan reached up, grabbed her around the neck with both hands, and strangled her until she became unresponsive and slumped over. Alhasan panicked and tried to administer CPR without success; he insists her subsequent death was an accident.

By contrast, medical evidence indicates Pip died due to ligature strangulation, likely from a belt.[1] Further, her injuries suggest she was strangled from behind, with the ligature pulled slightly upward.

A pathologist testified the strangling likely lasted at least two to three minutes in order to be lethal. Alhasan admits he was aware from his training as a surgical assistant that strangling a person for two to three minutes would cause death.

_____

[1] A pathologist testified that because Pip's hyoid bone was still intact, her killer likely did not kill her by strangling her with his hands. Also, two horizontal lines on her neck appeared consistent with a belt.

At about 8:50 a.m. that morning, Alhasan used his cell phone to search, "Is fleeing the country the best way to get away with murder" and "how long does it take till someone is considered missing." He also Googled "dumping a dead body" and then accessed a website entitled "Ten Ways to Dispose of a Dead Body if You Really Need To." That afternoon, he went to a travel agency and used cash to buy a one-way flight to Jordan.

According to Alhasan, he returned home that evening, covered Pip's body in a blanket, and put it in his car. Later that night, he drove to an alley, put Pip's body inside a duffel bag, and dumped the bag in a dumpster. He also abandoned Pip's minivan (which had been parked outside Steven's apartment) in a Walmart parking lot.

Shortly after midnight, a homeless man found Pip's body in the dumpster, and his friend called 911. Authorities later arrested Alhasan in the international terminal at Los Angeles International Airport.

## II.

### THE TRIAL

Alhasan was charged with first degree murder and related aggravating factors. He pleaded not guilty.

The defense moved in limine to preclude the admission of evidence concerning prior acts of domestic violence under Evidence Code[2] section 1109. The prosecutor explained she wished to call Alhasan's ex-girlfriend N.D. to testify about an incident in which Alhasan forcibly raped and choked her by pulling on her necklace. The trial court found any testimony about the rape would be "extremely prejudicial," but decided N.D. could testify about the rest following a section 402 hearing.

---

[2] All further undesignated statutory references are to this code.

4

Before N.D.'s testimony, the trial court read CALCRIM 852A to the jury, advising that they may, but are not required to, conclude from evidence of uncharged domestic violence that the defendant was disposed or inclined to commit domestic violence and thus was likely to commit an offense charged in this case.

N.D. testified that she dated Alhasan on and off from about 2012 to 2014, she was fearful of him throughout their relationship, and he became aggressive whenever she tried to break up with him. After one such attempted breakup, Alhasan appeared in her workplace parking lot as she was leaving work, pushed her into the car's passenger seat, demanded to know why she wanted to break up, and drove them on the freeway. He then cursed at her in Arabic and repeatedly spit on her. They stopped at a restaurant, and N.D. tried to walk away. Alhasan grabbed N.D. by the necklace, placing his fist tightly against her neck and under her chin, which restricted her airflow for a minute or two. He then let go and ran off.

N.D. also testified about another incident in which Alhasan shoved her shoulders to stop her from getting in a car, causing her to fall to the ground. He then picked her up and carried her to her parents' car against her will.

The jury found Alhasan guilty of first degree murder and found the aggravating factors true. The trial court sentenced him to 25 years to life in state prison and ordered him to pay $670 in various fees and fines.[3] The court then vacated those fees and fines based on Alhasan's inability to pay.

---

[3] Specifically, the trial court ordered a $30 criminal conviction assessment (Gov. Code, § 70373), a $40 court operations assessment (Pen. Code, § 1465.8), a $300 restitution fine (*id.*, § 1202.4), and a $300 parole

DISCUSSION

I.

THE TRIAL COURT PERMISSIBLY ADMITTED N.D.'S TESTIMONY

We see no error in the trial court's decision to admit N.D.'s testimony about Alhasan's prior domestic violence against her. This is "a criminal action in which the defendant is accused of an offense involving domestic violence," so propensity evidence of prior domestic violence is admissible "if the evidence is not inadmissible pursuant to Section 352." (§ 1109, subd. (a)(1).) "Section 1109 . . . supplants the usual rule of evidence that evidence of past conduct is not admissible to prove a defendant's conduct on a specified occasion." (*People v. Hoover* (2000) 77 Cal.App.4th 1020, 1026.) "We review a challenge to a trial court's decision to admit such evidence for abuse of discretion." (*People v. Johnson* (2010) 185 Cal.App.4th 520, 531.)

Alhasan asserts N.D.'s testimony about his pattern of aggressive behavior went beyond the scope of the trial court's evidentiary ruling. We read the record differently. The court ordered that N.D. could testify to everything except the rape, which it found would be "extremely prejudicial," and N.D. did just that.

In any event, N.D.'s testimony is admissible under sections 1109 and 352. Evidence that Alhasan abducted his ex-girlfriend and strangled her with her necklace during an argument was highly probative because this case also involved a strangling, with Alhasan claiming the death was some sort of accident. The probative value of this evidence was not "substantially outweighed" by any "substantial danger of undue prejudice." (§ 352.) The trial

revocation restitution fine (*id.*, § 1202.45), all of which it then vacated due to Alhasan's inability to pay.

court adequately sanitized the evidence by precluding N.D. from testifying that Alhasan raped her.

Finally, any error was harmless: the testimony took up a relatively small portion of a lengthy trial, the prosecution's case against Alhasan was exceptionally strong, and the court gave a limiting instruction, which the jury is presumed to have followed.

II.

## SUFFICIENT EVIDENCE SUPPORTED THE JURY'S FINDING OF PREMEDITATION AND DELIBERATION

Alhasan next claims the evidence was insufficient to support the jury's finding that he acted with premeditation and deliberation. (See Pen. Code, § 189, subd. (a) [first degree murder includes any killing that is "willful, deliberate, and premeditated"].) Again, we are not persuaded.

"'When considering a challenge to the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value— from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] . . . We presume in support of the judgment the existence of every fact the trier of fact reasonably could infer from the evidence. [Citation.] If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding.'" (*People v. D'Arcy* (2010) 48 Cal.4th 257, 293.)

"'In the context of first degree murder, "'premeditated' means 'considered beforehand,' and 'deliberate' means 'formed or arrived at or determined upon as a result of careful thought and weighing of

7

considerations for and against the proposed course of action.""''" (*People v. Houston* (2012) 54 Cal.4th 1186, 1216.) The key question is not the duration but rather the extent of the defendant's reflection. (*Ibid*.) In other words, does the evidence support an inference that the killing was the result of preexisting reflection, rather than unconsidered or rash impulse? (*Ibid*.)

"We normally consider three kinds of evidence to determine whether a finding of premeditation and deliberation is adequately supported—preexisting motive, planning activity, and manner of killing—but '[t]hese factors need not be present in any particular combination to find substantial evidence of premeditation and deliberation.'" (*People v. Jennings* (2010) 50 Cal.4th 616, 645.)

Applying those standards here, we conclude there is substantial evidence Alhasan killed Pip with premeditation and deliberation.

First, Alhasan had a demonstrable motive to kill Pip: he had significant money problems, she told him she was pregnant with twins, he was upset she decided not to have an abortion, and he was engaged to a woman in Jordan who did not know about Pip.

Second, there was evidence of planning. Medical evidence suggested Alhasan strangled Pip with a belt or other ligature. His selection and procurement of a murder weapon supports an inference of planning (see *People v. Elliot* (2005) 37 Cal.4th 453, 471), and the jury was entitled to draw the reasonable inference that he grabbed a belt for the specific purpose of choking Pip to death.

Third, the manner of killing supports premeditation and deliberation. Medical evidence indicates Alhasan strangled Pip from behind;

he was nearly twice her size[4] and was physically positioned to take advantage of that size disparity. He admittedly knew he needed to strangle her for at least two to three minutes to cause permanent brain damage and death. Collectively, this evidence suggests this was not an excited, rushed, or thoughtless act, but rather that Alhasan had ample time to consider his actions before Pip died.

## III.

### THE ABSTRACT OF JUDGMENT MUST BE CORRECTED

Alhasan's final argument concerns the abstract of judgment, which he asserts does not reflect the trial court's orders at sentencing. As noted, the court imposed $670 in fees and fines against Alhasan, which it then "vacated finding no ability to pay." The abstract of judgment, however, imposes those vacated fees and fines.

The Attorney General has no objection to modifying the abstract of judgment to reflect that the fees and fines are vacated. We therefore remand the matter so that the modification can be made. (See *People v. Baker* (2021) 10 Cal.5th 1044, 1109 [court has inherent power to correct clerical errors in abstract of judgment].)

### DISPOSITION

The matter is remanded to allow the trial court to amend the abstract of judgment to reflect that the $30 criminal conviction assessment (Gov. Code, § 70373), the $40 court operations assessment (Pen. Code, § 1465.8), the $300 restitution fine (*id.*, § 1202.4), and the $300 parole revocation restitution fine (*id.*, § 1202.45), were vacated. The court is directed

---

[4] Alhasan was 6'1" tall and about 220 pounds, whereas Pip was 5'4" tall and 126 pounds.

to prepare an amended abstract of judgment and forward a certified copy to the Department of Corrections and Rehabilitation. In all other respects, the judgment is affirmed.

SCOTT, J.

WE CONCUR:

MOORE, ACTING P. J.

GOODING, J.